USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 28, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
  PATRICIA J. RITCHIE,                               :
                                                     :
                            Plaintiff,               :
                                                     :
                    -v-                              :        12-cv-4992 (KBF)
                                                     :
                                                     :
  NORTHERN LEASING SYSTEMS,                          :        OPINION & ORDER
  INC. et al.,                                       :
                            Defendants.              :
--------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

       This case has been pending for over three and a half years.  During that time,

it has consumed extraordinary judicial resources and no doubt significant resources

from the parties as well.  There was a prolonged period before operative pleadings

were finalized and there were numerous discovery motions.  Little in this case was

accomplished without direct judicial intervention and oversight.  Having now had

the benefit of the parties' best collection of record evidence on these motions for

summary judgment, it is clear that this case should have never been brought.

Indeed, it is clear that the narrative which this Court was repeatedly told as to

what this case involved, was (kindly put) without evidentiary support.

       Plaintiff's core allegation is that she was dunned and sued for a debt that she

did not owe.  Indeed, she has argued that she could not possibly owe the debt as the

documentation underlying the obligation was based on a forgery.  According to

plaintiff, she was dunned and sued by an unscrupulous company that knew the

lease that formed the basis for its alleged entitlement to the debt had been forged.

Of course, an essential and implicit point in this story is that plaintiff never owed the debt in the first instance. The undisputed facts in the record tell a far different story.

The record leaves no doubt that plaintiff applied to lease equipment, signed documentation agreeing to make such payments, submitted bank account information to allow payments to be taken directly, made payments for an extended period of time, and used the equipment.  The record also reveals that what happened next was due to unique and personal circumstances that plaintiff alone controlled:  she closed up the business for which she used the equipment, returned the equipment to the wrong company, and stopped making payments for the equipment.  The debt collection calls and suit followed.

All of plaintiff's twelve myriad causes of action—sounding in civil RICO, fraud, and state and federal fair credit statutes—stem from five core allegations:

1) That defendants' letters and phone calls to her contained the false allegation that she owed them money;[1]

2) That defendants wrongfully deducted money from her bank account;[2]

3) That defendants impermissibly pulled her credit information;[3]

---

[1]   This is the basis of the RICO claim (based on predicate acts of federal mail and wire fraud) and the GBL § 349 claim.
[2]   This is the basis of the RICO claim based on the predicate act of federal wire fraud.
[3]   This is the basis of the federal FCRA claim (Counts III and IV), the NYFCRA claim (Counts VII, VIII, IX, and X), and the GBL § 349 claim.

4)   That defendants furnished false information about her account to a credit reporting agency;[4] and

5)   That defendants' New York Civil Court ("NYCC") lawsuit against her contained false allegations and was designed to extort money from her;[5]

The facts proffered by plaintiff on the motions before this Court do not support anything close to the claims alleged.  There is, for instance, no record evidence to raise a triable issue as to major aspects of the RICO or common-law fraud claims.  Alleging those claims on the true facts was frivolous.  The other claims—there are ten in total, including the New York General Business Law § 349 claim and other statutory claims—are similarly unsupportable.  Defendants have moved for summary judgment on all of plaintiff's affirmative claims—and the Court grants that motion now.  The Court also accordingly denies plaintiff's motion for partial summary judgment on the affirmative claims relating to the federal and state fair credit laws.  However, plaintiff's motion for summary judgment on the counterclaim is granted as unopposed.

---

[4]    This is the basis of the federal FCRA claim (Counts V and VI) and the GBL § 349 claim.
[5]    This is the basis of the RICO claim (based on predicate acts of Hobbs Act and New York extortion statutes) and the GBL § 349 claim.

## I.    FACTUAL BACKGROUND

The following facts are not in dispute unless stated otherwise.[6]

### A.    Plaintiff's Application for Credit Card Swiping Equipment

From approximately 2007 through 2009, plaintiff Patricia Ritchie operated a legal document preparation business called "Divorce Document Assistance."  (Defs.' Local R. 56.1 Stmt. of Material Facts Not in Dispute ("Defs.' 56.1") ¶ 10.)  In October 2008, plaintiff received an offer in the mail from a company called Merchant Made Easy ("MME"), inviting her to apply for credit card processing services and a credit card machine for her business.  (Defs.' 56.1 ¶ 15.)  After a telephone conversation with Fred Cox, an MME representative, plaintiff received a Merchant Processing Application (the "Application"), and reviewed its contents.  (Ritchie Dep., Def's 56.1 Ex. 2, ("Ritchie Dep.") at Tr. 186:9-17.)  The Application bore the logo of iPayment Inc.  The Application was prepared by a "Fred Cox" and sent to Ritchie via MME's fax; the fax header stated "Merchants Made Easy."  (Defs.' 56.1 ¶ 22, Ex. 4, ("Application"), at 0030.)  On October 13, 2008, plaintiff filled out and signed the Application in her own handwriting.  (Id. at 0032.)

The Application provides for the provision of equipment over a "Lease Term" of 48 months for a "Total monthly lease charge" of "$54.00 w/o Tax."[7]  (Defs.' 56.1 ¶ 22; Application at 0031.)  The Application further provides that if the "merchant"

---

[6]     The Court has also considered defendants' motion to strike.  As to any challenged Rule 56.1 statements or counterstatements or exhibits that are relevant to the Court's opinion, the Court addresses them individually and ignores inadmissible statements.  As to the other challenged items, the Court finds that they are not relevant to its decision.

[7]     The Application also states the lease is non-cancelable; plaintiff states that she initialed this term, but then whited out her initials.  (Ritchie Dep. Tr. 201:20-202:21; Application at 0031.)

(e.g. the individual who would be using the leased equipment in his or her business, here plaintiff) chooses to "receive products and/or services offered under one or more of the Third Party Agreements referenced in the Program Guide, they hereby acknowledge and agree that the executed Signature page of the application shall also serve as a signature page for each of the respective Third Party Agreement(s) . . ." (Application at 0032.)  The Application provides specific authorization for iPayment to obtain credit and financial information relating to Ritchie, perform credit checks and obtain other necessary financial information. (Id. at 0032.)

The Application bears the name and logo of the company iPayment, Inc., "a registered ISO / MSP of Wells Fargo Bank, N.A., Walnut Creek, CA." (Id. at 0030.) Other than the fax header indicating that it was sent to plaintiff by Merchants Made Easy, the Application does not mention MME, LFG, or Northern.  (Id. at 021-0024.)

Plaintiff faxed the completed Application to Cox, the representative from MME.  (Defs.' 56.1 ¶¶ 17, 21.)  Along with her Application, plaintiff also sent a copy of a voided check from her Bank of America business account for deduction of monthly lease payments.  (Defs.' 56.1 ¶¶ 13, 21, 23; Application at 0034.)

B.    The Lease

The cornerstone of plaintiff's case has always been that the lease obligation defendants used as the basis for debt collection was forged and without legal effect. That lease originated with MME, who provided it to defendants Lease Financing

Group ("LFG") and Northern Leasing Systems ("Northern").  MME is an

independent sales organization ("ISO") authorized to offer equipment leases on

behalf of defendant LFG, an equipment finance lessor that specializes in equipment

such as credit card swiping machines, (Defs.' 56.1 ¶¶ 1, 3-4), MME and LFG have

an independent contractor relationship.  (Defs.' 56.1 ¶ 6.)  Northern services leases

on behalf of LFG.  (Pl.'s Local R. 56.1 Stmt. of Material Facts Not in Dispute ("Pl.'s

56.1") ¶ 4.)  Defendant Jay Cohen is the CEO of Northern and defendant Ricardo

Brown is its Legal Recovery Director.  (Answer to SAC, ECF No. 118, ¶¶ 9, 12.)

When MME originates a lease and submits it to LFG, it makes several

representations and warranties, including that the signatures on the lease are

"genuine and duly authorized."  (Defs.' 56.1 ¶ 6.)  When LFG issues an equipment

finance lease to a lessee—usually a business entity who is offering its own

customers the option of using a credit card machine—it requires a personal

guarantor, usually a principal of the lessee.  (Defs.' 56.1 ¶ 3.)

On or about December 8, 2008, MME sent to LFG a three-page equipment

finance lease and guarantee ("the Lease") relating to equipment to be provided to

plaintiff Ritchie.  (Defs.' 56.1 ¶ 23.)  The Lease is for a Nurit 8010 credit card

swiping machine, and bears plaintiff's name and address[8] as the sole lessee and

personal guarantor and LFG as the lessor.  (Defs.' 56.1 ¶¶ 25-26.)  It also contains

information similar to that on the Application which plaintiff had filled out,

---

[8]     During the relevant period, plaintiff's address did not change.  (Ritchie Dep. 8:20-24; 9:22-24.)

including her social security number, bank account and bank routing numbers, and provides for a base monthly payment of $54, plus taxes and fees, and a term of 48 months.  (Defs.' 56.1 ¶¶ 27, 28.)  The Lease has two handwritten signature pages on it:  in the space for "Lessee #1 Signature" located over the print name "PATRICIA RITCHIE" on page one and in the space for "Guarantor Signature" on page two. (Defs.' 56.1 ¶ 29.)  It is undisputed that these signatures are not plaintiff's.  Put otherwise, it is accepted for purposes of this motion that they were forged; while plaintiff filled out an Application for the same equipment at the same price and according to the same terms, she did not execute the Lease.  At the same time that it received the Lease, Northern also received a copy of plaintiff's Application and a voided check associated with plaintiff's bank account.  (Defs.' Rule 56.1 Counterstatement of Material Facts ("Defs.' Counter Stmt.") ¶ 23-26.)

After receiving the Lease, Northern/LFG requested and obtained plaintiff's credit report from Experian, a credit reporting agency ("CRA").  (Defs.' 56.1 ¶ 34; Pl.'s 56.1 ¶ 81.)  Northern/LFG then obtained plaintiff's credit score.  (Pl.'s 56.1 ¶¶ 40-41.)  Northern/LFG did not provide plaintiff notice of these actions.  (Pl.'s 56.1 ¶ 88.)  On December 11, 2008, LFG approved the Lease.  It then paid MME an acquisition fee of $1,747.22.  (Defs.' 56.1 ¶ 37.)

C.    Plaintiff's Subsequent Actions and Inaction

As mentioned, the driving force behind plaintiff's claims is that her signatures on the Lease were forged.  (SAC ¶ 16.)  Although plaintiff admits that the signatures on the Application and voided check were genuine, she claims that

7

she never signed the subsequent lease with LFG.  A key factual question is whether defendants knew the Lease documents were forged.  There is no record evidence that they had any such knowledge, nor is there circumstantial proof from which a reasonably juror could draw a rational inference that they did.

Although LFG never received the original executed Lease, and therefore never had an "ink" signature, (Defs.' Counter Stmt. ¶ 21), it is undisputed that MME made a representation to LFG that Lease document was genuine.  (Defs.' 56.1 ¶ 30.)  It is also undisputed that LFG/ Northern fund about 3,500 to 4,000 leases a month.

Plaintiff first learned of the forged lease in connection with the debt collection suit defendants filed against her in February 2011.  She notified defendants that she believed the Lease to be a forgery when she filed her Answer to that suit. (Defs.' 56.1 ¶ 44, 89.)  There is no evidence in the record that defendants had any knowledge of the forged nature of the lease prior to that time.

To a large extent, discussed further below, the issue of the forgery is a classic red herring, as plaintiff's payment obligations attached in connection with the Application she executed.  Moreover, even plaintiff accepted that she was a lessee and had related lease obligations in connection with the equipment she received, albeit with MME, not LFG.  Plaintiff admits in her Complaint that she "leased a point-of-sale machine from a company called 'Merchants Made Easy.'"  (SAC ¶ 23.) She also asserts that she "believed that she could cancel the said lease with MME at

any time without any penalties." (Pl.'s Counter Statement of Material Facts (ECF No. 212), ¶ 3.)

It is undisputed that the equipment that plaintiff applied for was delivered to her home address. (Defs.' 56.1 ¶ 38.) She kept the machine in her possession until 2010. In the interim, she used the machine to process credit card transactions. (Defs.' 56.1 ¶¶ 40-41.) For thirteen months (January 2009 through January 2010), LFG debited funds from plaintiff's Bank of America account, totaling $1,027.92. (Defs.' 56.1 ¶ 45.) Plaintiff states that she "understood that the debits were from some company affiliated with MME and authorized to receive and administer the monthly payments debited from her account on behalf of MME." (Pl.'s Response to Defs.' 56.1 ¶ 46.) Plaintiff stated at her deposition that as of at least as of May 2009, she understood that the bank deductions came from LFG, not MME. (Ritchie Dep. Tr. 253:2-5; 249:2-250:14.) Plaintiff testified at her deposition that she attempted to call Fred Cox, the MME representative she had spoken to before regarding the application for the equipment, regarding this change but was never able to reach him. (Defs.' Resp. to Pl.'s 56.1 ¶ 73; Ritchie Dep. Tr. 259:2-260:6.)

In February 2010, plaintiff stopped operating her business. On February 11, 2010, she closed her bank account. (Defs.' 56.1 ¶¶ 51-52.) Plaintiff claims that around that time, she mailed the machine to an address for MME that she found on the Better Business Bureau website, along with a letter canceling the lease. (Defs.' 56.1 ¶ 88 (quoting Pl.'s Civil Court Answer ¶ 29).) There is no evidence in the

record that plaintiff ever received a confirmation of the equipment return or lease cancellation.

LFG unsuccessfully attempted to debit plaintiff's account on February 16, 2010, and learned that the account was closed.  (Defs.' 56.1 ¶ 54.)  Soon thereafter, Northern began making numerous attempts to collect on the account.  (Defs.' 56.1 ¶¶ 57-59.)  There is no question that many of these attempts reached plaintiff. Northern contacted plaintiff by phone and mail.  (Defs.' 56.1 ¶ 56.)  Plaintiff acknowledges she received the calls; however, she would either hang up or tell the caller not to call anymore.  She never told any caller that someone had forged her signature on the lease.  (Defs.' 56.1 ¶ 58.)  Defendant's log book included entries for the numerous phone calls, including one dated June 2, 2010 at 4:27 p.m. accompanied by the note "Contact Promise to Pay,[ ]pg sd busn closed will look into lease trans and cb for pymnt."  (Defs.' 56.1 ¶ 77; id. Ex. 13 at 3.)  Plaintiff states she cannot remember this conversation, (Ritchie Dep. Tr. 257:10-22), and disputes the veracity of this specific entry on the grounds that Northern made audio recordings of all calls, but had not produced this particular call during discovery.  (Pl.'s Resp. to Defs.' 56.1 ¶ 77.)[9]

Northern also mailed four invoices from February to June 2010 to Divorce Document Assistance to plaintiff's home address.  Plaintiff admits that she received each of these invoices.  (Defs.' 56.1 ¶ 59.)  She also admits that defendants mailed to

---

[9]      According to defendants, not "every call was recorded," and "If systems are down, recordings are not made, of course, but we try to record every call."  (Kravic Dep., Def.'s 56.1 Ex. 9, Tr. 83:2-5.)

her home address at least ten letters regarding the Lease.  (SAC ¶ 54b-k.)  The letters and calls included notices stating that failure to respond with payment would result in legal action.  (Defs.' 56.1 ¶ 80.)

Despite knowledge of the bank account debits and receipt of the calls and letters, plaintiff took no action.  (Defs.' 56.1 ¶¶ 44, 47, 50; Ritchie Dep. Tr. 245:20-25.)[10]  Plaintiff asserts that she did not respond to these requests for payment because she was overwhelmed with a number of personal issues including a cancer diagnosis, the death of her niece, and work.  (SAC ¶ 24; Ritchie Dep. Tr. 246:12-21.)  She testified that she took no action even when she received the calls because:

> I didn't want to talk to them. I – the bills that I was getting are in various amounts and, during that time, I was also going through some – a very, very hard time in my life, and that wasn't that important to me. These bills that were coming from this Lease Finance Group weren't – they just weren't that important.

(Ritchie Dep. Tr. 246:2-11.)

D.   Experian Charge-off and New York City Civil Court Lawsuit

In August 2010, December 2010, and February 2011, Northern / LFG again accessed plaintiff's consumer credit report from Experian.  (Pl.'s 56.1 ¶ 56.)  On September 1, 2010, LFG made an adverse entry on plaintiff's consumer credit

---

[10]   Plaintiff asserted in her Complaint that at this point she "categorically informed defendants that she had never signed any lease with them and demanded that they stop the harassment," (SAC ¶ 25), but now conceded that this is not true, as she did not communicate her allegation of forgery to defendants until May 2011 when she filed her Answer and Counterclaim in NYCC.

report that it had "charged off" $1,836 that plaintiff owed.  (Pl.'s 56.1 ¶¶ 89, 90.)
Northern /LFG then terminated plaintiff's account as a write-off.  (Pl.'s 56.1 ¶ 90.)

On February 16, 2011, LFG commenced an action against plaintiff in New York City Civil Court,[11] alleging that plaintiff breached her lease by failing to make payments due.  (Defs.' 56.1 ¶ 87.)  LFG's Complaint was filed by its attorney, Joseph Sussman and his law firm, Joseph I. Sussman, P.C., and verified by Northern's Legal Collections Supervisor Robert Taylor.  Plaintiff served her Answer on May 12, 2011, claiming that she had never seen the Lease before.  She also filed a Counterclaim asserting fraud, Fair Credit Reporting Act and Fair Debt Collection Protection Act claims.  (Defs.' 56.1 ¶ 88; Civil Court Answer & Counterclaim ("Civ. Ct. Answer") (Defs.' 56.1 Ex. 4) ¶¶ 20-21.)  Plaintiff stated in her Answer that she became aware of the debits in May 2010.  (Defs.' 56.1 ¶ 88; Civ. Ct. Answer ¶ 28.)

On or about April 3, 2012, plaintiff wrote a letter to Experian, disputing the adverse entry on her credit report from LFG.  (Pl.'s 56.1 ¶ 91.)  She also sent a copy of that letter to LFG.  (Defs.' Resp. to Pl.'s 56.1 ¶¶ 92-93.)  There is no record evidence that Experian contacted any defendant with a copy of plaintiff's April 2012 letter.

However, later in April 2012, Experian did send to Northern a computerized dispute form known as an Automated Consumer Dispute Verification ("ACDV"). (Defs.' Resp. to Pl.'s 56.1 ¶ 93.)  The ACDV form contained the following

---

[11]     The case, <u>Lease Financing Group, LLC v. Patricia J. Ritchie</u>, Index No. 006956/2011, remains pending.

information:  "NEVER HAD AN ACCT WITH THIS COMPANY HER LEASE WAS

WITH MERCHANT MADE EASY AND WAS PAID AND CLOSED

SATISFACTORILY."  (Defs.' 56.1 Ex. 31; Kravic Decl., ECF No. 190, ¶¶ 73, 75.)

Northern's log book for plaintiff's account recorded this in an entry dated

April 17, 2012 at 10:05 a.m., stating:

> RCVD EXPERIAN AUTOMATED CONSUMER DISPUTE VERIFICATION (ACDV) REGARDING C/O REPORTED; DISPUTE CODE IS SHOWN AS 1: NOT HIS.HERS.  PG STATES 'NEVER HAD AN ACCT WITH THIS COMPANY HER LEASE WAS WITH MERCHANT MADE EASY AND WAS PAID AND CLOSED SATISFACTORILY'

 (Defs.' 56.1, Ex. 13 at 1.)  The next entry was on the same date at 10:08 a.m.,

stating that:

> ACDV INVESTIGATION: REVIEWED NOTES. PG IS IN THE SUIT PROCESS PG IS DISPUTING LEASE.  RESPONDING TO ACDV: CHANGE DATA AS SHOWN TO ADD COMMENT STATING ACCT INFO IS DISPUTED BY CONSUMER.

(Defs.' 56.1, Ex. 13 at 1.)

> E.    The Instant Action

Plaintiff filed the instant suit in June 2012, asserting federal Fair Credit

Reporting Act ("FCRA") and New York Fair Credit Reporting Act ("NYFCRA")

claims against Northern, LFG, Brown, Taylor, and John Does.  (ECF No. 1.)  The

Hon. Kenneth M. Karas, to whom this case was originally assigned, granted leave to

amend; plaintiff filed an Amended Complaint in November 2012, alleging the same

causes of action against the same defendants as in the original Complaint.  (ECF

No. 8.)  Defendants moved to dismiss, and on March 31, 2014, Judge Karas partially

granted the motion, and dismissed without prejudice (1) the counts alleging

negligent violations of the FCRA, for failure to allege actual damages, and (2) the action with respect to John Doe defendants.  (ECF No. 22.)

In May 2014, defendants filed and Answer and Counterclaim.  (ECF No. 27.) The Counterclaim alleged that plaintiff breached the lease guarantee by failing to pay after February 2010, when she closed her bank account.

In December 2014, plaintiff moved to amend the First Amended Complaint, which defendants opposed.  On March 25, 2015, this action and a related case, Angermeir v. Cohen, 12 Civ. 55, were reassigned to the undersigned.  The Court granted plaintiff's motion to amend in April 2015.  (ECF No. 106.)  Plaintiffs filed the Second Amended Complaint on May 14, 2015.  (ECF No. 112.)  Defendants timely answered and again asserted a breach-of-guarantee counterclaim.  (ECF No. 118.)

Plaintiff's Second Amended Complaint is substantially broader than her prior complaints.  It added defendants Jay Cohen, Joseph Sussman, and Joseph Sussman P.C.  It also asserted a number of new claims under RICO, New York GBL § 349, and common law fraud.  (See SAC.)

In her RICO claim plaintiff alleges that defendants operated an enterprise whose activities constituted a racketeering scheme.  Specifically, she alleges the following actions in furtherance of the scheme:

- That defendants committed mail fraud by 1) sending the summons and complaint for a lawsuit that contained false assertions against her, and 2) mailing her letters falsely asserting that she owed them money;

14

- That defendants committed wire fraud by 1) pulling plaintiff's consumer credit report four times, 2) calling her and falsely asserting that she owed them money, and 3) deducting money from her bank account; and

- That defendants committed extortion by commencing a lawsuit against plaintiff designed to extort undeserved sums of money from her.

In addition, plaintiff also alleges a RICO conspiracy on the part of all defendants.

Plaintiff's claims of violations of federal and state fair credit reporting laws are based on defendants' allegedly (1) pulling her credit report for an impermissible purpose, (2) failing to provide her with required notice in connection with pulling her report, (3) failing to perform an adequate investigation after learning that she was disputing the authenticity of the Lease, and (4) reporting an unwarranted charge-off to the credit reporting agency.  Allegations (1) and (3) comprise the basis for the federal FCRA claims, while allegations (1), (2), (3), and (4) all comprise the basis for the NYFCRA claims.[12]

Plaintiff's GBL § 349 claim is based on the assertion that defendants have a practice of unlawfully pulling consumer credit reports, making false accusations in lawsuits, and making repetitive and dunning collection calls.

Finally, plaintiff alleges a general common-law fraud claim.

---

[12]    Plaintiff has asserted willful and negligent violations of both federal and state statutes.  The SAC re-pleads the negligence actions under the FCRA that were previously dismissed without prejudice for failure to allege actual damages, as it now includes a listing of actual damages.  (SAC ¶ 37).

II.     STANDARD OF REVIEW

A.     Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. Id. at 322-23.

In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010). Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal citations omitted). In addition, "[o]nly admissible evidence need be considered by the trial

court in ruling on a motion for summary judgment." Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) (internal quotation marks and citation omitted).

      B.    Civil RICO

The RICO statute provides that, "Any person injured in his business or property by reason of a [RICO] violation" may bring suit and recover treble damages and attorneys' fees and costs. 18 U.S.C. § 1964(c).  To support a civil RICO claim, a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).  To avoid summary judgment here, plaintiff must raise a triable issue as to one of these elements.

Pertinent to the determination of this motion are the definitions of "racketeering activity" and injury.  See 18 U.S.C. §§ 1951, 1961(a), (b).  Turning to the first of these, "racketeering activity" is defined by the nature, quantum and relatedness of specified activity.  Mail and wire fraud as well as extortion are among the types of possible predicate acts, see 18 U.S.C. § 1961(a), (b), and they are the type alleged by plaintiff here.  The quantum and relatedness requirements are referred to together in the concept of a RICO "pattern" of activity.  H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989) ("[T]o prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.")  A pattern of activity requires more than a single, isolated predicate act, and there must be a showing of relationship between predicate acts.  Id., 439 U.S. at 240.  This requires that the

acts have the "same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events."  Id.; see also United States v. Eppolito, 543 F.3d 25, 57 (2d Cir. 2008) ("To prove relatedness, the government [or plaintiff] may show either that the individual predicate acts were directly related to each other or that they were related to the enterprise in a way that made them indirectly connected to each other." (internal quotation marks omitted)).  In addition, the conduct must be continuing.  H.J. Inc., 492 U.S. at 241 ("'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.").  Put otherwise, a single completed act that is unlikely to recur cannot support a RICO claim.  See GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 466 (2d Cir. 1995).

Thus, for plaintiff to survive summary judgment, she must (1) raise a triable issue as to more than a single claim of extortion or mail/wire fraud, (2) raise a triable issue as to their relatedness, and (3) raise a triable issue on the question of whether they amount to or pose a threat of continued criminal activity.  H.J. Inc., 492 U.S. at 239.

Turning to RICO injury, to support a civil RICO claim, a plaintiff must demonstrate that "he has been injured in his business or property by the conduct constituting the violation."  Sedima, 473 U.S. at 496; see also 18 U.S.C. § 1964.  This requires a showing of "compensable injury," defined as "harm caused by predicate

acts sufficiently related to constitute a pattern." <u>Sedima</u>, 473 U.S. at 497.  To survive this motion for summary judgment, plaintiff must only raise a triable issue as to her RICO injury.

Plaintiff also alleges RICO conspiracy.  RICO conspiracy requires "[intent] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." <u>Baisch v. Gallina</u>, 346 F.3d 366, 376-77 (2d Cir. 2003).  However, a RICO conspiracy claim requires proper pleading of a substantive RICO allegation.  <u>First Capital Asset Mgmt., Inc. v. Satinwood, Inc.</u>, 385 F.3d 159, 182 (2d Cir. 2004).  Finally, when a plaintiff seeks a civil cause of action based on RICO conspiracy, "an injury from an overt act is necessary and sufficient to establish civil standing." <u>Hecht v. Commerce Clearing House, Inc.</u>, 897 F.2d 21, 25 (2d Cir. 1990).

C.    <u>FCRA</u>

The federal Fair Credit Reporting Act, 15 U.S.C. § 1681, <u>et seq.</u>, aims to ensure "that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b).  The FCRA "places distinct obligations on three types of entities: consumer reporting agencies, users of consumer reports, and furnishers of information to consumer reporting agencies." <u>O'Diah v. New York City</u>, No. 02 Civ.

19

274 (DLC), 2002 WL 1941179, at *12 (S.D.N.Y. Aug. 21, 2002).  Defendants in this

action are both users of consumer reports and furnishers of information.

> A users of consumer report must not:
>
> [U]se or obtain a consumer report for any purpose unless—
> (1) the consumer report is obtained for a purpose for which the consumer
> report is authorized to be furnished under this section; and
> (2) the purpose is certified in accordance with section 1681e of this title by a
> prospective user of the report through a general or specific certification.

15 U.S.C. § 1681b(f)

> Furnishers of information to CRAs must abide by the following rules:
>
> After receiving notice [from a credit reporting agency] pursuant to section
> 1681i(a)(2) of this title of a dispute with regard to the completeness or
> accuracy of any information provided by a person to a consumer reporting
> agency, the person shall—
> (A) conduct an investigation with respect to the disputed information;
> (B) review all relevant information provided by the consumer reporting
> agency pursuant to section 1681i(a)(2) of this title;
> (C) report the results of the investigation to the consumer reporting agency;
> and
> (D) if the investigation finds that the information is incomplete or inaccurate,
> report those results to all other consumer reporting agencies to which the
> person furnished the information and that compile and maintain files on
> consumers on a nationwide basis.

15 U.S.C. § 1681s–2(b)(1).

The FCRA attaches civil liability for willful noncompliance,[13] 15 U.S.C.

§ 1681n, as well as negligent failure to comply, 15 U.S.C. § 1681o.  Damages for

willful noncompliance include actual damages not to exceed $1,000, punitive

damages, and attorney's fees and costs.  15 U.S.C. § 1681n.  Damages for negligent

---

[13]     Under the FCRA, willful noncompliance also encompasses reckless violations.  <u>Safeco Ins.
Co. of Am. V. Burr</u>, 551 U.S. 47, 57 (2007).

noncompliance include uncapped actual damages and costs and attorney's fees and costs.  15 U.S.C. § 1681o.

The FCRA also has two express preemption sections, 15 U.S.C.A. § 1681t and 15 U.S.C. § 1681h(e).  Section 1681t expressly preempts state laws that relate to 15 U.S.C. § 1681s-2, which regulates obligations relating to furnishers of information under, and several subsections of § 1681m, which regulates notice obligations of users of information. Section 1681h(e) provides that various actions, including negligence actions, cannot be brought based on information disclosed pursuant to § 1681m and certain other FCRA provisions.

D.   <u>NYFCRA</u>

The New York Fair Credit Reporting Act also provides a private right of action for both willful and negligent noncompliance.  Willful noncompliance gives rise to actual damages, punitive damages, and attorney's fees and costs.  N.Y. Gen. Bus. Law § 380-l.  Negligent noncompliance gives rise to actual damages and attorney's fees and costs.  N.Y. Gen. Bus. Law § 380-m.

The relevant sections of the New York FCRA in this action are those establishing obligations for users of consumer credit reports and furnishers of information to CRAs.  Plaintiff allege that defendants violated N.Y. Gen. Bus. Law § 380-b(b), which provides that

> No person shall request a consumer report, other than an investigative consumer report, in connection with an application made after the effective date of this article, for credit, employment, insurance, or rental or lease of residences, unless the applicant is first informed in writing or in the same manner in which the application is made that (i) a consumer report may be requested in connection with such application, and (ii) the applicant upon

> request will be informed whether or not a consumer report was requested, and if such report was requested, informed of the name and address of the consumer reporting agency that furnished the report.

Thus, while the "permissible purpose" provision of the NYFCRA applies to the CRA and not to the user of information, N.Y. Gen. Bus. Law. § 380-b(a), the NYFCRA also requires notice to the applicant "in writing or in the same manner in which the application is made" if a report is requested, N.Y. Gen. Bus. Law § 380-b(b), a provision that is not in the federal FCRA.

As to furnishers of information, the NYFCRA prohibits the knowing and willful introduction of "false information into a consumer reporting agency's files for the purpose of wrongfully damaging or wrongfully enhancing the credit information of any individual."  N.Y. Gen. Bus. Law § 380-o.

E.    New York Gen. Bus. Law § 349

New York's GBL § 349 is a part of the New York Consumer Protection Act, "enacted to provide consumers with a means of redress for injuries caused by unlawfully deceptive acts and practices."  Goshen v. Mut. Life Ins. Co. of New York, 98 N.Y.2d 314, 323 (2002).  A GBL § 349 claim requires that "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015) (quoting Koch v. Acker, Merrall & Condit Co., 18 N.Y.3d 940, 944 (2012)).  The consumer does not need to be an individual, as a business can bring suit under GBL § 349 against competitors.  Securitron Magnalock Corp. v. Schnabolk, 65 F.3d

256, 264 (2d Cir. 1995).  The definition of "deceptive acts and practices" is an objective one "limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances."  <u>Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.</u>, 85 N.Y.2d 20, 26 (1995).

## III.  DISCUSSION

This case presents an all too familiar situation in which there is a direct correlation between the number of claims and their weakness.  Here, plaintiff has asserted twelve different causes of action.  All fail.  The Court first addresses the RICO and fraud claims as their deficiencies share certain similar characteristics.  Then the Court turns to the remaining claims.

To summarize, the RICO and fraud claims fail for the simple reason that plaintiff has not raised a triable issue on the critical element of intent.  But in addition, the claims fail because they both rely on assertions of fraud and yet there is no triable issue as to any false or misleading statement on which plaintiff relied to her detriment.  In terms of extortion, she has failed to raise a triable issue on the requirement of a wrongful taking of her property. Finally, she has failed to raise a triable issue that she has suffered the type of injury necessary to support a RICO claim.

### A.    <u>Requisite Intent</u>

Plaintiff's RICO claim, which relies on predicate acts of mail/wire fraud and extortion, as well as her common law fraud claim, each require a showing of specific intent.  <u>United States v. Regan</u>, 937 F.2d 823, 827 (2d Cir.) <u>amended</u>, 946 F.2d 188

(2d Cir. 1991) (holding that mail and wire fraud are "specific intent crimes," requiring proof that defendants had "a conscious and knowing intent to defraud"); United States v. Scacchetti, 668 F. 2d 643, 649 (2d Cir. 1982) (noting that to have a "wrongful purpose" in connection with extortion requires intent); Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 599 (2d Cir. 1991) ("Under New York Law, a common law fraud claim requires proof that plaintiff justifiably relied on a false representation of material fact made by defendant with intent to deceive, and that plaintiff was damaged thereby." (emphasis added)).

In an attempt to raise a triable issue on this element, plaintiff has put forward two facts: (1) that the lease the MME provided to LFG was a forgery, and (2) that the leasing costs for the equipment far exceeded its value. Neither point assists plaintiff. From these, argues plaintiff, a rational juror may infer sufficient wrongful intent to raise a triable issue. Plaintiff is incorrect.

The Court turns first to the forgery. As previewed above, the lack of an authentic signature by the plaintiff on the lease document sent by MME to LFG is the centerpiece of her case. Even assuming that that is true—which the Court does for purposes of this motion—that fact alone fails to raise a triable issue as to intent for any predicate act or common law fraud. The record is clear that the derivation of forgery was MME—a non-party in this case. It was then transferred to LFG. To raise a triable issue as to LFG's intent, either to defraud or seek her property in a wrongful manner, plaintiff must proffer some evidence from which a rational juror could infer that LFG had, should have had or could have had some knowledge that

MME's representation as to authenticity was false.  She has not done so.  Indeed, there is no evidence that, prior to the time that she filed her answer in the collection suit, defendants knew or could have known the lease was forged.

It is uncontested that the documentation MME provided to LFG contained plaintiff's true name, address, social security number, and bank account information; it is also uncontested that as part of the transfer of the lease to LFG, MME provided a representation as to the authenticity of the documentation.  It is further uncontested that over the period of time plaintiff possessed, used and made monthly payments on the equipment, she did not raise any issue regarding the legitimacy of the lease relationship.[14]  Thus, on the issue of intent, the forgery does not alone raise a triable issue.[15]

The Court turns next to the question of the cost/value differential.  Plaintiff has proffered evidence that the leased equipment retails for less than one-third the amount that LFG/Northern paid to MME to acquire the lease.  According to plaintiff, this fact alone supports an inference of fraudulent intent and wrongful conduct by defendants.  On the facts as developed in the record on this motion, the Court disagrees.

_____

[14]     Defendants have argued that, in any event, the federal Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001 and the New York State Electronic Signatures and Records Act, N.Y. Tech. Law § 304, provide that an electronic signature has the same effect as an ink signature.  Plaintiff does not respond to this point in her papers.

[15]     Plaintiff argues that defendants knew or should have known that the lease was forged LFG/Northern did not have a physical "ink" copy of the lease.  Plaintiff infers bad faith from this.  But plaintiff fails to present any evidence that by its nature a non-original copy of a lease is suggestive of forgery.  The absence of an original of the lease is insufficient to raise a triable issue on the question of intent.

It ought to come as no surprise that leases for commercial goods may ultimately result in profit to the lessor, sometimes a substantial profit. There is nothing unlawful with profit, even substantial profit. By definition, profit for an equipment lease may mean that income received exceeds all-in cost. Such a structure—which is all that plaintiff alleges here—is no more than a statement as to how leasing typically works. It is certainly true that there may be instances in which cost/price differential may provide some indication of unlawful scheme; but more than the mere fact of profit is needed and that is all that plaintiff has proffered here.

Missing the key intent element to support the predicate acts for her RICO claim, or her common law fraud claim, these claims must be dismissed. It goes without saying that as she cannot make out this element, she never gets to the additional and also dispositive issue of lacking a RICO pattern.[16]

B.    Mail/Wire Fraud Predicate Acts

Plaintiff has also failed to proffer evidence to raise a triable issue relating to the predicate acts of mail/wire fraud or her common law fraud claim for an additional, independent reason. She has failed to proffer any evidence of a false or misleading statement or omission on which she relied. See Sergeants Benevolent

---

[16]    The Court need not separately reach the pattern issue as the failure on intent is sufficient to support dismissal. However, it is absolutely clear that in all events plaintiff alleges a single act that forms the basis of her claims: an attempt to collect on a debt to her; that claim is tied to her assertion of the forged lease. There is no circumstance under which this single act—even when accomplished by way of multiple telephone communications and a debt collection lawsuit— constitutes a "pattern" of conduct. See H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989); GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 466 (2d Cir. 1995).

<u>Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP</u>, 806 F.3d 71, 87 (2d Cir. 2015) (holding that that plaintiffs in mail fraud cases must establish that defendants' alleged misrepresentation was the but-for and proximate cause of plaintiffs' injury, which usually requires proof of reliance).

 According to plaintiff, defendants' fraudulent act consists of their seeking payment on a debt supported by a forged lease.  Notably, plaintiff concedes that she signed the Application pursuant to which she initially agreed to lease the equipment for the lease amount defendants later sought to collect.  Her claim requires that this Court ignore the Application, assume that the payment obligation is only supported by the forged lease, and further and most importantly find a triable issue as to whether defendants knew or had reason to know of that forgery.  She has raised a triable issue on none of these questions.  Most importantly, and sufficient for resolution of this motion, is the lack of a triable issue as to the latter question.

But even if we assume that the debt was not due and owing, plaintiff has failed to raise a triable issue on the question of reliance.  In this regard, she has utterly failed to demonstrate that she relied to her detriment on defendants' collection efforts by way of the telephone calls, letters or lawsuit, and their repeated assertion of the debt due.

Plaintiff does not oppose defendants' motion on this issue, but rather asserts that reliance is unnecessary.  While a mail or wire fraud action need not allege first-person reliance by the plaintiff herself, it does need to show that "someone—

whether the plaintiffs themselves or third parties—relied on the defendant's misrepresentations." Sergeants Benevolent Ass'n, 806 F.3d at 87 (citing Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 658 (2008)).  Plaintiff fails to proffer any facts suggesting that anyone relied on defendants' alleged fraud with respect to the NYCC Complaint, a requirement under Bridge, 553 U.S. at 685.  In fact, she concedes that she ignored defendants' efforts until she was sued, at which time she answered the lawsuit and denied any payment obligation.

     C.    Lack of Wrongful Extortionate Act

Plaintiff's claim of extortion as a predicate act fails for an additional reason. As discussed above, such a claim requires a showing of specific intent as to which there is no triable issue here.  Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951; N.Y. Penal Law § 155.05.  "Wrongful use" in this context is defined as "obtaining money or a thing of value from another by use of threats to reputation only if the defendant has no plausible claim of right to the money demanded or if there is no nexus between the threat and the defendant's claim." United States v. Jackson, 196 F.3d 383, 387 (2d Cir. 1999); see also DeFalco v. Bernas, 244 F.3d 286, 318 (2d Cir. 2001).  Here, the allegedly extortionate acts were the debt collection telephone calls, letters and suit.  But, if plaintiffs were seeking payments to which they were entitled, their actions were not wrongful. United States v. Clemente, 640 F.2d 1069, 1077 (2d Cir. 1981) ("[T]he use of fear of economic loss to obtain property to which one is not

entitled is wrongful. It is obvious that the use of fear of financial injury is not inherently wrongful."). As discussed above and throughout, there is no evidence that defendants knew that they were not entitled to the amounts sought. <u>United States v. Scacchetti</u>, 668 F.2d 643, 649 (2d Cir. 1982) (noting that the "wrongful use" element requires requisite intent).

To the extent that the debt collection suit is an alleged extortionate act, the claim must also fail. The law is clear that litigation—even if frivolous or malicious—cannot constitute extortion.

> There are sound policy reasons against recognizing the instigation of meritless litigation as a RICO predicate act. Recognizing such litigation as a predicate RICO act would give complainants unprecedented access to federal courts and the treble damage remedy authorized under RICO. Such a significant extension of RICO's reach is best made, if at all, by Congress. Moreover, allowing these suits to proceed as RICO suits risks chilling parties' resort to the judicial system to resolve their disputes.

<u>FindTheBest.com, Inc. v. Lumen View Tech. LLC</u>, 20 F. Supp. 3d 451, 457 (S.D.N.Y. 2014). Numerous courts that have considered the same issue agree. <u>See</u> <u>id.</u> (collecting cases); <u>see also</u> <u>Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n</u>, 776 F.3d 1343, 1349 (Fed. Cir. 2014), <u>cert. denied</u>, 136 S. Ct. 119, 193 L. Ed. 2d 208 (2015) ("Treating meritless litigation as a form of extortion punishable under RICO would substantially chill even valid court petitioning."); <u>Deck v. Engineered Laminates</u>, 349 F.3d 1253, 1258 (10th Cir. 2003) ("Extortion is the antithesis of litigation as a means of resolving disputes. To promote social stability, we encourage resort to the courts rather than resort to force and violence. Yet recognizing abusive litigation as a form of extortion would subject almost any

unsuccessful lawsuit to a colorable extortion (and often a RICO) claim."); United States v. Pendergraft, 297 F.3d 1198, 1207-08 (11th Cir. 2002) (holding that threats to sue, "even if made in bad faith and supported by false affidavits, was not 'wrongful' within the meaning of the Hobbs Act" because, inter alia, "[c]riminalizing false testimony via the Hobbs Act would expand the scope of witness liability" beyond what Congress intended); Vemco, Inc. v. Camardella, 23 F.3d 129, 134 (6th Cir.1994) ("A threat of litigation if a party fails to fulfill even a fraudulent contract . . . does not constitute extortion."); I.S. Joseph Co. v. J. Lauritzen A/S, 751 F.2d 265, 267 (8th Cir. 1984) (holding that bad-faith suits "may be tortious under state law, but we decline to expand the federal extortion statute to make it a crime"). But see Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 365 (9th Cir. 2005) (noting that the RICO statute "provides that conduct relating to prior litigation may constitute racketeering activity. 18 U.S.C. § 1961(1)(B) (defining racketeering activity as including an act indictable under 18 U.S.C. § 1512, which relates to tampering with a witness, victim, or informant)").

### D.   Lack of RICO Injury

There are additional reasons why plaintiff's RICO claims fail. As discussed above, injury in an essential element of a RICO claim. A person can only seek civil remedy for a RICO violation if he has been "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964. Injury proximately caused by a predicate act is central to whether a plaintiff has standing to assert a RICO claim. Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23 (2d Cir. 1990)

("The RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence.")

Plaintiff has failed to raise a triable issue as to RICO injury.  While she was subject to debt collection telephone calls, letters and a collection suit, there is no evidence that she suffered any actual injury.  She testified that she took no action in response to the letters and telephone calls and concedes that she ignored all mailings and would hang up or tell the callers to stop calling.  (Defs.' 56.1 ¶ 58.) There is no evidence that defendants' actions resulted in payment.  Thus, the only injury is the personal experience of harassment plaintiff felt.  But this is not cognizable injury for purposes of a RICO claim.[17]  See 18 U.S.C.A. § 1964; Gotlin ex rel. County of Richmond v. Lederman, 483 Fed. Appx. 583, 586 (2d Cir. 2012) ("[I]njuries [that] are personal in nature do not constitute injury to 'business or property' as those terms are used in RICO." (internal citations omitted)).

E.    Lack of RICO Conspiracy

Because plaintiff has failed to plead any substantive RICO claim, her RICO conspiracy claim also fails.  See First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 182 (2d Cir. 2004); Discon, Inc. v. NYNEX Corp., 93 F.3d 1055 (2d Cir. 1966), vacated on other grounds, 525 U.S. 128 (1998) (a RICO conspiracy claim "necessarily must fail if the substantive claims are themselves deficient").

---

[17]    Plaintiff alleges that she was injured by defendants' lawsuit because she paid court fees in order to file her Answer and Counterclaim in the NYCC action.  To the extent that this constitutes RICO injury, the extortion claim based on the NYCC suit fails for the reasons stated above.

Furthermore, plaintiff's lack of injury means she does not have standing for the substantive as well as the conspiracy claims based on civil RICO.  See Hecht v. Commerce Clearing House, Inc., 897 F.2d at 25 (2d Cir. 1990).

       F.    FCRA Claims

Plaintiff asserts a number of claims (Counts III-X) based on federal and state fair credit reporting statutes.  None withstands scrutiny.

As a threshold matter, none of the individual defendants Cohen, Brown, Taylor, and Sussman (or his firm) accessed plaintiff's credit report, and never furnished any information about her to any credit reporting agency.  (Defs.' 56.1 ¶¶ 93-94.)  There is no triable issue as to any of these defendants on these claims.

Moreover, to the extent that plaintiff's theory as to them has morphed into a type of conspiracy theory, it must fail.  There is no "catch-all" civil conspiracy statute under federal law and she has failed to raise a triable issue as to civil conspiracy under state law.  Under New York law, a plaintiff alleging civil conspiracy must show "(1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage."  Kashi v. Gratsos, 790 F.2d 1050, 1055 (2d Cir. 1986).  To survive summary judgment here, plaintiff must raise a triable issue as to these elements and she has failed to do so with regard to these individual defendants.  Accordingly, Counts III-IX are dismissed against the individual defendants.

The Court turns to plaintiff's remaining federal fair credit reporting claims with regard to the corporate defendants.

### 1.    FCRA impermissible access

Plaintiff alleges that defendants willfully or negligently violated the FCRA by accessing her credit report without a permissible purpose.  15 U.S.C. § 1681b. However, the undisputed evidence demonstrates that defendants intended to use plaintiff's credit information for a permissible purpose each time they pulled her report.

A party is not liable under the FCRA if it obtains consumer information for a purpose enumerated in 15 U.S.C.A. § 1681b(a), such as when the party

> [I]ntends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer" and when the party "has a legitimate business need for the information-- (i) in connection with a business transaction that is initiated by the consumer; or (ii) to review an account to determine whether the consumer continues to meet the terms of the account.

15 U.S.C. § 1681b(a).  The statute's plain language indicates that if the party obtaining the report had the intent to use it for one of the specified permissible purposes, there has been no violation of the FCRA.  Braun v. Client Servs. Inc., 14 F. Supp. 3d 391, 396 (S.D.N.Y. 2014) ("To state a claim for willful or negligent acquisition of a credit report under the FCRA, a plaintiff must allege facts showing each of the following: (i) there was a consumer report; (ii) the defendants used or obtained it; (iii) the defendants did so without a permissible statutory purpose, and (iv) the defendants acted with the specified culpable mental state." (quoting King v.

Equable Ascent Fin., LLC, No. 12 Civ. 443 (CCE), 2013 WL 2474377, at *2

(M.D.N.C. June 10, 2013))).  The fact that plaintiff did not in fact have an account

with defendants is irrelevant if defendants had the intent to use the report for a

permissible purpose.  See Trikas v. Universal Card Servs. Corp., 351 F. Supp. 2d 37,

42 (E.D.N.Y. 2005) (holding that as long as defendant intended to use the report for

a permissible purpose, the fact that consumer account was left open in error was

irrelevant); Perretta v. Capital Acquisitions & Mgmt. Co., No. 02 Civ. 5561 (RMW),

2003 WL 21383757, at *5, n.7 (N.D. Cal. May 5, 2003) (holding that the FCRA "does

not appear to require the existence of a debtor-creditor relationship for a party to

lawfully acquire a consumer report").

Plaintiff does not dispute that LFG intended to use plaintiff's credit report to

attempt to collect on her account on August 20, 2010, December 8, 2010, and

February 7, 2011.  (Def's 56.1 ¶¶ 34, 56.)  This is enumerated as a permissible

purpose under 15 U.S.C. § 1681b(a).  See also Huertas v. Galaxy Asset Mgmt., 641

F.3d 28, 34 (3d Cir. 2011); Betz v. Jefferson Capital Sys., LLC, 68 F. Supp. 3d 130,

134 (D.D.C. 2014) ("It is well settled that a debt collector need not verify a debt

prior to collection . . . or seeking a credit report." (internal citations omitted));

Stonehart v. Rosenthal, No. 01 Civ. 651 (SAS), 2001 WL 910771, at *4 (S.D.N.Y.

Aug. 13, 2001) (holding that "debt collection for accounts other than pure 'credit

transactions' may constitute a permissible purpose under section 1681b").

Plaintiff argues that defendants' initial December 2008 use of the credit

report was for an impermissible purpose—funding the ISO—in December 2008.

34

However, there is no question that another purpose of the December 2008 credit report pull was to decide whether or not to price the lease—in other words, collecting "information in connection with a credit transaction involving the consumer." 15 U.S.C. § 1681b(a); Braun, 14 F. Supp. 3d at 166; see also Nasca v. J.P. Morgan Chase Bank, N.A., No. 06 Civ. 3472 (SHS), 2007 WL 678407 at *1 (S.D.N.Y. 2007) (noting that if "[a] credit transaction is not initiated by the consumer, the credit report may be issued only if 'the transaction consists of a firm offer of credit . . . . '"). Plaintiff cites to Northern's Rule 30(b)(6) deposition and suggests that defendants only used the credit report to determine what to pay MME. (Pl.'s Resp. to Defs.' 56.1 ¶¶ 33-35.) However, as defendants point out, the witness unequivocally stated that "Northern Leasing uses the credit scores for . . . making a determination whether to fund the lease or not." (Kravic Dep., Lillienstein Decl. ECF No. 217, Ex. 1, Tr. 52:22-53:15.) The fact that defendants used the credit report both for pricing the lease and for determining how much to fund the ISO does not make the obtaining the credit report impermissible. Therefore, plaintiff's claim under FCRA's § 1681b fails as a matter of law.

### 2.   FCRA obligation as furnisher of information

The FCRA imposes civil liability on parties who furnish information to CRAs who fail to fulfill statutory obligations after they receive a disputed report from the CRA. However, the obligations only attach "[a]fter receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency."

15 U.S.C. § 1681s–2(b)(1).[18]  In turn, section 1681i(a)(2) provides that a CRA must

"provide notification of the dispute to any person who provided any item of

information in dispute."  15 U.S.C. § 1681i(a)(2).

    The statute is "quite clear" that a violation can occur only if it "post-dat[es]

the furnisher's receipt of a report <u>from the credit reporting agency</u>. If Congress had

meant to create liability for violations once the furnisher had notice from any source

of the existence of a dispute, it would have been a simple matter to say so." <u>Elmore</u>

<u>v. N. Fork Bancorporation, Inc.</u>, 325 F. Supp. 2d 336, 340 (S.D.N.Y. 2004) (emphasis

in original).  Plaintiff alleges that defendants failed to investigate after they

received her letter disputing her credit report.  However, the record evidence does

not show that the Experian, the CRA to whom plaintiff sent her letter, ever

forwarded the letter to defendants—the crucial step that triggers defendants'

obligations under 15 U.S.C. § 1681s-2(b)(1).  <u>See</u> <u>Elmore</u>, 325 F. Supp. at 340; <u>see</u>

<u>also</u> <u>Markovskaya v. Am. Home Mortgage Servicing, Inc.</u>, 867 F. Supp. 2d 340, 344

(E.D.N.Y. 2012); <u>Nguyen v. Ridgewood Sav. Bank</u>, No. 14-CV-1058 MKB, 2015 WL

2354308, at *8 (E.D.N.Y. May 15, 2015); <u>Redhead v. Winston & Winston, P.C.</u>, No.

01 Civ. 11475 (DLC), 2002 WL 31106934, at *5 (S.D.N.Y. Sept. 20, 2002).  Instead,

defendants only had an obligation to investigate <u>after</u> they received a notice of

---

[18]    Section § 1681s-2(b) is distinct from § 1681s-2(a), which imposes an affirmative obligation to correct and update information.  There is no private right of action under § 1681s-2(a); nor does plaintiff plead a cause of action under that statute.  <u>See</u> <u>Longman v. Wachovia Bank, N.A.</u>, 702 F.3d 148, 151 (2d Cir. 2012) ("[T]here is no private cause of action for violations of § 1681s–2(a)."); <u>see also</u> <u>Seamans v. Temple Univ.</u>, 744 F.3d 853, 867 (3d Cir. 2014) ("In other words, the fact that a furnisher is affirmatively obligated to flag an account as disputed under § 1681s–2(a) does not undermine the conclusion that a *failure* to flag the account as disputed also constitutes a material inaccuracy under § 1681s–2(b).").

dispute from Experian; in this case, that occurred on April 17, 2012, after Experian sent an ADCV regarding plaintiff to defendants, not when they received a letter directly from plaintiff.  (Defs.' 56.1, Ex. 13, at 1; id. Ex. 31.)

Under § 1681s-2(b), defendants had an obligation to 1) "conduct an investigation with respect to the disputed information," 2) "review all relevant information provided by the CRA," 3) "report the results of the investigation to the [CRA]," and 4) "if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs]" that had received the information.  15 U.S.C. § 1681s-2(b)(1).  There is no record evidence suggesting that defendants failed to meet these obligations.  It is undisputed that the ACDV form contained statement about plaintiff's account: "NEVER HAD AN ACCT WITH THIS COMPANY HER LEASE WAS WITH MERCHANT MADE EASY AND WAS PAID AND CLOSED SATISFACTORILY."  (Defs.' 56.1 Ex. 31; Kravic Decl., ECF No. 190, ¶¶ 73, 75.)  The fact that plaintiff was making this allegation, of course, was true.  Upon receiving the ACDV, defendants understood that plaintiff's account was in the "suit process" and that plaintiff contested the charges; defendants then responded to Experian confirming that there was indeed a dispute on plaintiff's account.  (Defs.' 56.1, Ex. 13 at 1.)  Plaintiff has not alleged that the ACDV contained any incomplete or inaccurate information; therefore, defendants met their obligation when they confirmed the facts in the ACDV—that plaintiff was disputing her account.  See Seamans v. Temple Univ., 744 F.3d 853, 867 (3d Cir. 2014) ("[A] private cause of action arises under 15 U.S.C. § 1681s–2(b) when, having received

notice of a consumer's potentially meritorious dispute, a furnisher subsequently fails to report that the claim is disputed.").

Plaintiff also contends that LFG's log report indicating that an employee opened the ACDV entry at 10:15 a.m. and closed out of the response entry at 10:17 a.m. is probative of its failure to investigate.  (See Def's 56.1 Ex. 13 at 1.)  Yet the fact that an employee took two minutes to look up plaintiff's information, discover that her account was indeed in the lawsuit process, and report that fact as consistent with her disputing the account does not suggest a violation of § 1681s–2(b)(1).  LFG's verification that the account was in dispute, in this case, satisfied its obligations as a matter of law.

Finally, plaintiff appears to maintain that defendants should have asked Experian to delete the charge-off after learning of her disputed claim.  (Comp. ¶ 119.)  That is not the obligation imposed by the FCRA, which simply requires the furnisher of information to investigate, and to report information from the investigation.  15 U.S.C. § 1681s–2(b)(1); see also Saunders v. Branch Banking And Trust Co. Of VA, 526 F.3d 142, 149 (4th Cir. 2008) ("[Section] 1681s–2(b) . . . imposes an obligation to review the previously disclosed information and report whether it was 'incomplete or inaccurate' upon receipt of a notice of dispute from a CRA.").[19]  Because the information contained in the ACDV—that the account was in

---

[19]     In fact, some courts have held that failing to report a meritless dispute would not necessarily give rise to liability under § 1681s–2(b) because "reporting an actual debt without noting that it is disputed is unlikely to be materially misleading."  See, e.g., Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1163 (9th Cir. 2009).

dispute and that plaintiff claims her lease was with MME and was closed satisfactorily—was accurate, defendants had no further obligations to report further information to Experian.[20]

G.   NYFCRA claims

Plaintiff also alleges violations of two provisions under the NYFCRA: 1) that defendants pulled plaintiff's consumer credit report without giving her required notice, and 2) that defendants furnished incorrect information to a CRA.  Plaintiff also incorporates these allegations into her GBL § 349 claim for deceptive practices.[21]

In substance, these NYFCRA allegations largely mirror the causes of action under the federal FCRA, and they fail for similar reasons.  Below, this Court addresses issues unique the New York statute.

Defendants argue that plaintiff's NYFCRA claims fail as a matter of law because the NYFCRA only provide a remedy to New York consumers, and because plaintiff is a California resident, she cannot recover.  Plaintiff does not oppose the merits of this argument; accordingly, the Court finds in favor of defendants on that issue.[22]  The Court need not reach the merits of the residency argument, however,

---

[20]   LFG also did not report to Experian information aimed to negate or cast doubt on plaintiff's claim that she "never had an [account]" – for example, it did not send to Experian a copy of its lawsuit, or any other information challenging plaintiff's allegations such as its call logs and letters sent to plaintiff's address.

[21]   Plaintiff alleges that 1) that defendants' unauthorized pulling of plaintiff's consumer credit reports without notice, and 2) that defendants "trash[ed]" plaintiff's consumer credit report," and thus violated GBL § 349.

[22]   Plaintiff only argues that this Court allowed her to amend her Complaint to add these claims—and ipso facto, has ruled that the claims are viable as a matter of law.  This is not so.  The Court explicitly reserved a ruling on the viability of these claims until summary judgment, stating,

as it finds for defendants on both NYFCRA claims because they are preempted by the federal FCRA. NYFCRA's notice provision, § 380-b(b), and furnisher of information provision, § 380-o, both set out obligations for users and furnishers of information that impinge on federal provisions that the FCRA expressly preempts.

The FCRA has two express provisions for preemption. One provision provides:

> No requirement or prohibition may be imposed under the laws of any State—
>
> (1) with respect to any subject matter regulated under
>
> [...]
>
> (C) subsections (a) and (b) of section 1681m of this title, relating to the duties of a person who takes any adverse action with respect to a consumer;
>
> [...]
>
> (F) section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies
>
> [...]
>
> (I) section 1681m(h) of this title, relating to the duties of users of consumer reports to provide notice with respect to terms in certain credit transactions;

15 U.S.C. § 1681t(b).

Another provision provides that:

> [N]o consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of

---

"if it's true as a matter of law, and there is support for the defense's arguments as to 349 of the GBL and 380 of the GBL, if the facts don't show that there's any there-there in terms of being able to meet the legal requirements, these will be [t]hrown out on summary judgment." (Tr. Apr. 16, 2015, ECF No. 70 in Angermier v. Cohen, 12 Civ. 55, at 4-5 (emphasis added).)

> this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e).  The Second Circuit has held that these two preemption

provisions are "not in conflict" with each other.  MacPherson v. JPMorgan Chase

Bank, N.A., 665 F.3d 45, 47-48 (2d Cir. 2011).  In addition, § 1681t(b) does not only

preempt state statutes, but also state common law.  Id. at 47 (citing Premium

Mortgage Corp. v. Equifax, Inc., 583 F.3d 103 (2d Cir. 2009)).

### 1.   Preemption of Section 380-o

State laws that impose obligations on "furnishers of information to consumer

reporting agencies" are preempted by the FCRA.  Section 1681s-2 of the FCRA,

which sets forth responsibilities for furnishers, is specifically listed as preempting

state laws impinging on the same subject.  15 U.S.C. § 1681t(1)(F); Galper v. JP

Morgan Chase Bank, N.A., 802 F.3d 437, 446 (2d Cir. 2015) ("[W]e hold that

§ 1681t(b)(1)(F) preempts only those claims that concern a furnisher's

responsibilities.").

Plaintiff brings a claim under the NYFCRA's reporting provision, N.Y. Gen.

Bus. Law § 380-o, which prohibits furnishers from introducing false information to

CRAs.[23]  Plaintiff's claim under § 380-o addresses the very "same subject matter"—

---

[23]     In any event, plaintiff's claims based on this NYFCRA claim largely mirror her federal claim, which for the reasons stated above, fail as a matter of law.  The only difference between plaintiff's state and federal claims as to defendants' obligations as a furnisher of information is that under the state claim, plaintiff also alleges that defendants unlawfully reported that LFG charged off $1,836, which plaintiff claims was based on false information.  However, plaintiff fails to state a cause of action under N.Y. Gen. Bus. Law § 380-o, which requires "knowing and willful introduction of false

responsibilities of furnishers of information—as her federal FCPA claim under

section 1681s-2(b).  (See SAC ¶ 138 (alleging that defendants "introduced false

information concerning Ms. Ritchie" into the CRA's files and "willfully refused to

retract such false information, or even investigate Ms. Ritchie's assertions" that the

information is false").  As the Second Circuit held in Galper, section 1681s-2

preempts claims that "concerns a furnisher's responsibilities."  Galper, 802 F.3d at

446.  Since section 380-o of the NYFCRA squarely addresses a furnisher's

responsibilities, it is therefore preempted by the federal statute.[24]

In addition, to the extent that the GBL § 349 claim and common law fraud

claim are based on defendants' obligations as furnishers of information to CRAs,

they are also preempted.  See MacPherson v. JP Morgan Chase Bank, N.A., No. 09

Civ. 1774 (AWT), 2010 WL 3081278, at *4 (D. Conn. Aug. 5, 2010) aff'd sub nom.

Macpherson v. JPMorgan Chase Bank, N.A., 665 F.3d 45 (2d Cir. 2011); Gross v.

Washington Mut., Inc., No. 06 Civ. 4340 (RLC), 2007 WL 1404435, at *4 (S.D.N.Y.

May 10, 2007) (noting that the FCRA mandates "complete preemption of state law

claims arising out of consumer disputes with furnishers of information" (internal

---

information" for the purpose of wrongfully damaging" credit.  As the charge-off happened in
September 2010, months before plaintiff ever contacted either Experian or any defendant regarding
the debt, there is no evidence that defendants knowingly and willfully introduced false information
in order to damage plaintiff's credit.

[24]      Although the Second Circuit held in Scott v. Real Estate Fin. Grp., 183 F.3d 97, 100 (2d Cir.
1999) that "[t]he New York statutes relevant to a false pretenses claim contain language similar to
that of the parallel federal provisions . . . [t]herefore, the two statutes must be construed in the same
way," the issue of preemption was not under review.  The comparison that the Scott Court drew was
between "15 U.S.C. §§ 1681b(3), 1681q (pre-1996 amendments version) [and] . . . N.Y. Gen. Bus. L. §§
380-b(a)(3), 380-o."  Id.  Neither § 1681b nor § 1681q are listed as FCRA provisions that preempt
state laws under § 1681t(1).

quotations omitted)).  Plaintiff did not oppose defendant's motion for summary

judgment on this basis.

2.   Preemption of Section 380-b(b)

The NYFCRA also requires that an applicant for credit must be given notice

if her consumer report may be requested.  N.Y. Gen. Bus. Law § 380-b(b).[25]

Defendants acknowledge that they did not provide such notice to plaintiff.  (Pl.'s

56.1 ¶ 88.)[26]

However, the federal FCRA statute already sets forth notice obligations for

users of consumer credit information.  Specifically, section 1681m(a) of the FCRA

requires that a user of consumer credit information must "provide oral, written, or

electronic notice" to a consumer if it takes "any adverse action with respect to any

consumer that is based in whole or in part on any information contained in a

consumer report."  The FCRA expressly preempts state laws "with respect to any

---

[25]     Plaintiff also refers to the "permissible use" portion of § 380-b, but § 380-b only imposes an
obligation on the part of the CRA to only furnish consumer credit information "to a person whom it
has reason to believe intends to use the information" for a permissible purpose; this statute does not
discuss obligations of recipients of that information.  N.Y. Gen. Bus. Law § 380-b(a).  Because
defendants are not CRAs, and are thus not covered by § 380-b(a), we need only reach the question of
whether the notice provision, § 380-b(b), applies.

[26]     Defendant's argument for summary judgment on the basis that § 380-b(b) does not protect
plaintiff because she did not actually make an application for credit is unpersuasive and foreclosed
by the undisputed facts in this case.  The Court is persuaded by plaintiff's reading of the statute,
which states that "No person shall request a consumer report . . . in connection with an <u>application
made</u> after the effective date of this article, for credit, employment, insurance, or rental or lease of
residences, unless the applicant is first informed in writing . . . ."  N.Y. Gen. Bus. Law § 380-b(b)
(emphasis added).  There is no dispute that plaintiff did apply for credit—as she submitted an
application to MME.  Furthermore, the <u>Pietrafesa</u> case cited by defendants is inapplicable here, as it
concerned the conduct of a credit report aggregator who provided aggregate reports to a third party,
not in response to any "application for credit" by the subject of the report or anyone else.  <u>Pietrafesa
v. First Am. Real Estate Info. Servs., Inc.</u>, No. 1:05-CV-1450, 2007 WL 710197, at *6 (N.D.N.Y. Mar.
6, 2007).  Indeed, defendant's position—that plaintiff cannot simultaneously allege that she did not
apply for credit under the Lease and that she did make an application for credit—is rather
disingenuous, as defendants try to take advantage of the same.

subject matter regulated under" section 1681m(a), which concern "duties of a person who takes any adverse action with respect to a consumer."  15 U.S.C. § 1681m(a).  The question is, therefore, whether NYFCRA's § 380-b(b), which require notice to the consumer <u>whenever</u> a consumer credit report may be requested, is pre-empted by the federal FCRA's notice requirement under 15 U.S.C. § 1681m(a), which only requires notice <u>only if</u> adverse action is taken based on the contents of the report received.

A close reading at the plain wording of both statutes indicates that the answer is yes.[27]  The subtitle for § 1681m is the "requirements on users of consumer reports."  15 U.S.C. § 1681m.  Subsection (a) specifically discusses those requirements with respect to notice, and requires notice only if the user of the credit report took adverse action based on the reported information.  15 U.S.C. § 1681m(a).  Similarly, NYFCRA § 380-b(b)'s subject matter is a user of credit information's duty to provide notice—and that is the subject matter of plaintiff's cause of action.  As discussed above, FCRA's § 1681t(b) "expresses Congress's intent to preempt claims which are with respect to any subject matter regulated under" section 1681m(a).  <u>Galper</u>, 802 F.3d at 445.  The federal statute therefore preempts plaintiff's claim under NYFCRA § 380-b(b), because the state claim impinges on the "subject matter" of the federal statute

---

[27]     The Court may resolve preemption issues <u>sua sponte</u> if the material facts are undisputed and the question is purely one of law.  <u>Island Park, LLC v. CSX Transp.</u>, 559 F.3d 96, 100-01 (2d Cir. 2009); <u>Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury</u>, 445 F.3d 136, 141 (2d Cir. 2006) (Sotomayor, J.) (partially affirming district court's <u>sua sponte</u> grant of summary judgment on preemption grounds).  The Court also provided parties an opportunity to brief the preemption issue. (<u>See</u> Feb. 4, 2016 Order, ECF No. 260.)

Beyond the "subject matter" preemption that FCRA § 1681t(1) establishes, the federal and state notice provisions create obligations that actually conflict with each other in several ways.  In Safeco Ins. Co. of Am. v. Burr, the Supreme Court ruled that the notice requirement under FCRA § 1681m is limited to "only when the adverse action is based in whole or in part on a consumer report" and not "when a business acts adversely merely after consulting a report."  551 U.S. 47, 63-64 (2007).  The Court reasoned that "not all adverse actions require notice" and "the duty report arises from some practical consequence of reading the report."  Id.  The NYFCRA provision, on the other hand, broadens the notice requirement to categorically require users of information to provide notice whenever "a consumer report may be requested in connection with" an initial application for credit.  N.Y. Gen. Bus. Law § 380-b(b).  This broadening is in conflict with duties contemplated by the federal statute, which sets out a much narrower burden.

It is also unlikely that Congress intended FCRA § 1681m(a), the federal notice provision, to be substantially made broader by patchwork state statutes, especially since it specifically listed § 1681m(a) as one of the provisions that would preempt state statutes on the same subject matter.  See Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1172 (9th Cir. 2009) ("[T]here is evidence that the statutory scheme [of the FCRA], which establishes national requirements and preempts most state regulation, was motivated at least in part by a desire for uniformity of reporting obligations"); Willey v. J.P. Morgan Chase, N.A., No. 09 Civ. 1397(CM), 2009 WL 1938987, at *8 (S.D.N.Y. July 7, 2009) (holding that § 1681t(1)

"implies broad preemption of state law claims is more consistent with Congress'[s] intent" in enacting the FCRA).

In addition, adjacent subsections of the New York statute also contravene the FCRA by narrowing its notice obligations.  Subsection (c) of the NYFCRA notice requirement states that "subsequent consumer reports . . . may be requested or utilized in connection with an update, renewal, or extension of the credit . . . [with] no notice to the consumer . . . at the time such subsequent report is requested." N.Y. Gen. Bus. Law. § 380-b(c).  However, the federal notice provision is stricter, requiring notice to the consumer whenever there is "adverse action"—including upon subsequent updates and renewals.  Safeco, 551 U.S. at 67 (holding that the "adverse action" upon renewal occurs if the renewal rate is adverse when compared to "the previous rate or charge").  This is further evidence that the NYFCRA's notice provision asserted by plaintiff is preempted by § 1681m(a) of the FCRA.

For the same reasons, the portions of the GBL § 349 and fraud claims that pertain to responsibilities of furnishers of information and notice requirements for users of credit reports are also preempted.  We turn to plaintiff's other theories under GBL § 349 below.

     H.    GBL § 349 claims

N.Y. Gen. Bus. Law § 349 claim requires that "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015)

(quoting <u>Koch v. Acker, Merrall & Condit Co.</u>, 18 N.Y.3d 940, 944 (2012).

Consumer-oriented conduct must "have a broad impact on consumers at large."

<u>New York Univ. v. Cont'l Ins. Co.</u>, 87 N.Y.2d 308, 320 (1995).  Plaintiff asserts that

defendants violated GBL § 349 by unlawfully pulling consumer credit reports,

making false accusations in lawsuits, and making and sending repetitive dunning

calls and letters.

    Plaintiff does not oppose defendant's argument for dismissal on the bases

that 1) she was not deceived by defendants' alleged conduct, and 2) the alleged

actions do not constitute consumer-oriented conduct;[28] she has therefore abandoned

her claim.  <u>Robinson v. Am. Int'l Grp., Inc.</u>, No. 08 Civ. 1724 (LAK), 2009 WL

3154312, at *4 (S.D.N.Y. Sept. 30, 2009) <u>aff'd sub nom.</u> <u>Robinson v. Am. Int'l Grp.</u>,

396 F. App'x 781 (2d Cir. 2010).  The Court reviews the claim pursuant to Fed. R.

Civ. R. 56(c)(3) and considers facts set forth by defendants as undisputed.  Plaintiff

fails to satisfy crucial elements of a GBL § 349 claim.

    First, plaintiff has not proffered any evidence that plaintiff suffered injury as

a result of defendants' allegedly deceptive practices.  <u>Oswego Laborers' Local 214</u>

<u>Pension Fund v. Marine Midland Bank, N.A.</u>, 85 N.Y.2d 20, 26 (1995) (holding that

a GBL § 349 plaintiff "must show that the defendant engaged in a material

---

[28]    Plaintiff belatedly moves for summary judgment on her GBL § 349 claim in her opposition brief to defendants' motion to strike.  This, of course, is impermissible, as plaintiff chose to forgo moving on this claim in her partial summary judgment motion three-and-a-half months prior, and chose to ignore defendants' summary judgment motion on this issue.  Moreover, even in her belated motion, plaintiff does not substantively contest the fact that her dispute with defendants is not "consumer-oriented"; she merely asserts that "the material concerning other lawsuits show that Defendants' conduct at issue is a general practice affecting other consumers."  (Pl.'s Br. in Opp. to Def.'s Mot. to Strike, ECF No. 240, at 21.)  This conclusory statement cannot save her claim.

deceptive act or practice that caused actual, although not necessarily pecuniary,

harm"). Specifically, "in order to have been injured by the defendant's deceptive act,

a plaintiff must have been personally misled or deceived." LaCourte v. JP Morgan

Chase & Co., No. 12 Civ. 9453 (JSR), 2013 WL 4830935, at *10 (S.D.N.Y. Sept. 4,

2013). Plaintiff herself admits that she was not deceived by defendants—she

consciously ignored defendants' phone calls and letters, and answered the lawsuit

by asserting forgery and counterclaims against defendant. She was also aware of,

and disputed, the entries made in her credit report. Therefore, plaintiff's GBL § 349

claims must be dismissed.

Second, the GBL § 349 claim fails because there is no record evidence

suggesting that defendants' alleged practices broadly impact consumers at large, a

requirement under the statute. Although some of these alleged practices

theoretically under difference circumstances could be of a type that broadly impact

consumers, see, e.g., Mayfield v. Asta Funding, Inc., 95 F. Supp. 3d 685, 700

(S.D.N.Y. 2015), plaintiff has failed to put forth evidence that they do so here. [29]

While plaintiff need not bring evidence of "a repetition or pattern of deceptive

behavior," she does need to show that there is a broader impact. Oswego, 85 N.Y.2d

---

[29]    Plaintiffs allege that defendants violated GBL § 349 by alleging false information in the
lawsuit against her. Although it is clear that Northern has sued other individuals in New York
courts, there is no record evidence that defendants made false statements in those suits. The merely
filing of claims is insufficient to support the cause of action plaintiff pled under GBL §349.
        Plaintiff also acknowledged that documents from other lawsuits—the admissibility of which
this Court has serious doubt—are not proffered for the truth of the matter but rather "to prove the
fact that Defendants received them." (Pl.'s Opp. Br. to Def.'s Mot. to Strike at 17-19.) This
eliminates any triable issue on the consumer-oriented nature of defendants' alleged statements
against her in her lawsuit.

at 25.  The alleged conduct in this action is "unique as to the parties" and there is no evidence that defendants makes systematic misrepresentations in the same manner as is alleged here.  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 64 (2d Cir. 2010); see also Euchner-USA, Inc. v. Hartford Cas. Ins. Co., 754 F.3d 136, 143 (2d Cir. 2014); DeAngelis v. Corzine, 17 F. Supp. 3d 270, 284 (S.D.N.Y. 2014).

I.  <u>Counterclaim</u>

Defendants did not oppose plaintiff's motion for summary judgment on the Counterclaim.  Plaintiff argues that because she never signed the lease in question, she is not bound by its guarantees.  Defendants agrees that for the purposes of their own summary judgment motion, they do not contest plaintiff's assertion that she did not sign the lease in question.  (Defs.' Br. ISO Mot. Summ. J., ECF No. 197, at 1, n.2.)  Because plaintiff is not bound by the lease terms, plaintiff's motion for summary judgment on the Counterclaim is GRANTED.

IV.  CONCLUSION[30]

For the reasons set forth above, defendants' motion for summary judgment is GRANTED in its entirety.  Plaintiff's partial motion for summary judgment on the FCRA and NYFCRA are DENIED; her motion for summary judgment on the Counterclaim is GRANTED.  Because the Court has resolved the case on summary judgment, defendants' <u>Daubert</u> motion and motions <u>in limine</u> are moot.  The Clerk

---

[30]    There are a number of additional arguments, many of which are quite confused and poorly briefed.  To the extent that they are intelligible, the Court has reviewed them and found them to be without merit.

49

of Court is directed to terminate the motions at ECF Nos. 184, 189, 224, 247, and

255, and to terminate this action.

      SO ORDERED.

Dated:      New York, New York
             March 28, 2016

                              _____
                                KATHERINE B. FORREST
                              United States District Judge